**DEREK SMITH LAW GROUP PLLC**                    *Counsel for Plaintiff*
By: <u>SCOTT E. DIAMOND, ESQUIRE</u>
Attorney ID No.:
1835 Market St., Suite 2950
Philadelphia, Pennsylvania 19103
(215) 391-4790
scott@dereksmithlaw.com

## IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **CELIENA MCCLELLAND**, | : | **COMPLAINT** |
| | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | No. |
| | : | |
| **DECHERT, LLP and** | : | JURY TRIAL DEMANDED |
| **ELAINE WRY** (Individually) | : | |
| | : | |
| Defendants. | : | |

Plaintiff, Celiena McClelland, by and through his counsel, The Derek Smith Law Group, PLLC, brings this civil action against Defendants, DECHERT, LLP, and ELAINE WRY (*individually*), (hereafter collectively "Defendants"). Upon information and belief and in support thereof, Plaintiff alleges as follows:

## I.  <u>NATURE OF THE COMPLAINT</u>

1.      This is an action seeking damages to redress the injuries Plaintiff has suffered, and continues to suffer, as a result of unlawful employment discrimination and retaliation by Defendant against Plaintiff in violation of 42 U.S.C. §1981, Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17 (amended in 1972, 1978 and by the Civil Rights Act of 1991, Pub. L. No. 102-166 ("Title VII")), and to remedy violations of the Pennsylvania Human Relations Act, as amended, 43 P.S. §§ 951, *et. seq.* ("PHRA").

## II.  PARTIES

2.         Plaintiff, **CELIENA MCCLELLAND** (hereafter "Plaintiff") is an individual African

American female and resident of the Commonwealth of Pennsylvania, residing at 5517 Willows

Avenue Philadelphia, PA  19143

3.         Defendant, **DECHERT, LLP** (hereafter "DECHERT" or "Defendant") is a

business corporation duly authorized to conduct business and subject to the laws of the

Commonwealth of Pennsylvania and Federal Laws, doing business in several states and having

more than 15 employees. Dechert is located at 2929 Arch Street, Philadelphia, Pennsylvania

19104.

4.         Defendant, **ELAINE WRY (**hereafter "WRY") is an adult individual female and

was and upon information and belief still is employed by Defendant **DECHERT.**

5.         At all times material, Defendant **WRY** was employed by Defendant **DECHERT**

and held supervisory authority over Plaintiff.

6.         **WRY** is named as a Defendant both in her individual capacity, and his corporate

capacity as an employee of Defendant **DECHERT**.

7.         Defendant(s) accepted, agreed, adopted, acquiesced, and/or otherwise was bound

by the actions, omissions, and conduct of its owners, managers, supervisors, employees, and

agents including **WRY**.

## III. JURISDICTION & VENUE

22.        This Court has subject matter jurisdiction over Plaintiff's claims arising under

Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. § 2000e, *et seq*. ("Title VII")

and 42 U.S.C § 1981, pursuant to 28 U.S.C. §1331, and 29 U.S.C. § 216(b).

23.    Venue in this Court is proper under 28 U.S.C. § 1391(b) because a substantial part of the acts or omissions giving rise to the claims alleged herein occurred within this judicial district, and Defendants are subject to personal jurisdiction in this district.

## IV. EXHAUSTION OF ADMINISTRATIVE REMEDIES

24.    On March 8, 2021, Plaintiff dual-filed a Charge of Discrimination (Charge No. 530-2021-02300) with the Equal Employment Opportunity Commission ("EEOC") and The Pennsylvania Human Relations Commission.

25.    Plaintiff received a Notice of Right to Sue from the EEOC on June 2, 2021, for her Charge of Discrimination.

26.    Plaintiff's claims under the Pennsylvania Human Relations Act ("PHRA") are still pending before Pennsylvania Human Relations Commission ("PHRC") because less than one year has elapsed since PHRC assumed jurisdiction over his charges. After one year, Plaintiff will seek leave to amend this complaint to assert his PHRA claims.

## V.  FACTUAL ALLEGATIONS

1.  Plaintiff Was hired by Dechert LLP to work in the billing department in or around 2000.

2.  In December 2020 Plaintiff was constructively discharged and forced to submit her letter of resignation due to the racial discrimination and harassment that she was subjected to by her manager Wry, Director Financial Operations.

3.  Wry's bias towards Plaintiff was racially motivated and began in February 2019. Plaintiff is an African American woman and Wry is Asian.  Wry treated Plaintiff as though she were incompetent, unintelligent, and unworthy of the authority and respect of Plaintiff's position at the Employer.  For example, Plaintiff was often given unrealistic deadlines and an excessive workload which made the working environment hostile. The

unrealistic deadlines and excessive workload were not required by Plaintiff's Non-African American counterparts.

4. In February 2019 early in Wry tenure with Dechert, she began to display that she did not trust Plaintiff's ability to lead the Billing Team.  Wry was an extreme micromanager only with Plaintiff. On many occasions Wry would contact billing members asking them questions about Plaintiff with neither reason nor provocation. Team Members informed Plaintiff of Wry's activity. Wry did not micromanage Non-African Americans

5. In February through March of 2019 three billers resigned from Plaintiff's team. Wry summoned Plaintiff to her office asked if the billers were leaving because of Wry. Plaintiff responded that the billers were leaving because they had been complaining about not making enough money and that other firms were paying their billers over $10k more than Dechert.

6. As a result of the meeting Wry contacted Human Resources and requested the last 10 years of exit interviews for the billing department. At the time Wry clearly knew why the billers were leaving as it was not a secret.  The billers were complaining to many people that their salaries were less than comparable positions at other firms. Wry told Plaintiff that the exit interviews were being looked at for analysis purposes. The requested information was to be completely anonymous such that the names, dates and any identifying information would not be revealed. On May 16, 2019, Wry discussed the information with Plaintiff along with Gary, from Human Resources.  During the meeting Gary and Wry blindsided Plaintiff insinuating that that she was the reason for the high turnover rate in the billing department. Plaintiff was told that past billers mentioned issues with Plaintiff's communication skills.   After almost 20 years of service to Dechert,

this was the first time anyone mentioned to Plaintiff that she had communication issues. Wry, determined to sabotage Plaintiff with Human Resources present, began to discuss unrelated issues with Plaintiff in an effort to undermine her credibility and performance at the Firm. For example, Wry mentioned that she heard Plaintiff being short with a biller named Henry White.  Plaintiff was not short withy Mr. White. Wry's intent was not to analyze the information, but to embellish the information to create a false narrative about Plaintiff to Human Resources. Plaintiff believed that the criticism of her was not based in fact but was based upon Wry's discriminatory conduct due to Plaintiff being African American.

7.  Wry accused Plaintiff of using a bad tone with a biller but could not specify to whom or when that complaint was made. Wry stated that Plaintiff was against advancement of her team members and used a biller, Mark Constantine as an example. Wry wanted Constantine to be moved away from Plaintiff's team to a different department, the e-billing team. Plaintiff had denied Wry's request because he was needed for billing on Plaintiff's short-staffed team, and he was not knowledgeable enough of e-billing. Therefore, he was not qualified for the job.

8.  Wry then stated that Plaintiff was against using an e-billing coordinator Jason Carroll to conduct training. Plaintiff knew that Carroll had issues with his confidence and at that time had not been trained on how to conduct a training session. Plaintiff worked with him and scheduled him to conduct a training session on preparing reports with the e-billing team so that he would be trained and to give him structure for presenting material for training.

9. Wry asserted that Plaintiff had no patience when training new billers.  Once again, this is the first time that Plaintiff was ever given this information in addition Wry had not witnessed this from Plaintiff. At this point in the meeting Wry had started to get frustrated because she was not able to substantiate her claims against Plaintiff. Wry demonstrated that she was against Plaintiff being a manager.  All of these events occurred within three months of Plaintiff working under Wry.  No other Caucasian employee was being sabotaged. Plaintiff was intentionally being targeting due to her race.

10. April 11, 2019, there was a scheduled telephone conference with client Airbus. Plaintiff was told by Wry that some members in attendance would not be announced (introduced) during the call as to not overwhelm the client.  In attendance was Airbus (client), Wry (Director Financial Operations), Troy Senter (CFO), Wil Rivera (E-Billing Supervisor), Anthony Bash (Financial Operations Manager EMEA office), Allan Chan (Billing Supervisor, EMEA office), Isabel Campos (Billing Supervisor, NY office) and Plaintiff. Wry, Senter, Rivera and Plaintiff were all in a conference room in the Philadelphia office. Earlier in the week Plaintiff informed Wry that she would be attending a funeral that day and would need to leave the office at 10am.  Wry had no issue with Plaintiff leaving for the funeral.  Plaintiff reminded Wry again that same day of her need to attend the funeral. During the meeting everyone was announced except for Rivera and Plaintiff. At some point during the meeting Senter said "our E-billing Manager, Wil Rivera has a question". Rivera neither indicated he had a question, nor had he been announced as an attendee of the meeting. Rivera was not the E-billing manager, he was a supervisor.  The Plaintiff was the manager of the billing and e-billing departments. Rivera was junior to Plaintiff and Plaintiff was the only person in attendance that had not been announced, and the only

African American person in attendance.  Once the meeting ended, Plaintiff gathered her

things to leave the conference room. After the client was disconnected, Wry told the

others in attendance that Plaintiff was also in the room only because they heard Wry ask

Plaintiff to stay for a debrief. Shortly after that Wry went to Plaintiff's cubicle as she was

gathering her personal things to leave and noticed that Plaintiff was upset and asked to

talk to her.   Plaintiff told Wry that she had to leave and that she  would be back.

11. When Plaintiff returned that afternoon Wry called her into her office to reprimanded

Plaintiff and accused Plaintiff of being unprofessional. Wry stated that she did not

appreciate Plaintiff walking off the job and that Plaintiff had gotten loud with her on the

floor.  Wry was fabricating the entire episode. Plaintiff had not raised her voice. Plaintiff

then reminded Wry that she was informed at least twice of the funeral. That accusation of

the Plaintiff "walked off the job" was a mischaracterization of the facts.

12. Wry then wanted to talk about what happened in the meeting because she knew that

Plaintiff was upset. Plaintiff told her that she felt Senter was inappropriate when he called

Rivera the manager of the e-billing department. In fact, that was Plaintiff's position.  In

addition, Rivera did not have a question and the only reason to call on Rivera was to

introduce him as the manager.

13.  Wry asked Plaintiff if she could tell Senter about the conversation and Plaintiff agreed

that she could, Plaintiff had nothing to hide as a twenty-year employee of the firm.

Several days later Senter scheduled to meet with Plaintiff in his office.  The purpose of

the meeting was to discuss the Airbus meeting. During the meeting he started the

conversation asking Plaintiff why she walked off the job. Plaintiff informed him that she

has never walked off the job that she had a funeral to attend and that her attendance was

approved by Wry in advance.  He then stated that Plaintiff should have reminded Wry on that day, which Plaintiff did. Wry had obviously complained to Senter about Plaintiff being upset but never told him that Plaintiff had a funeral to attend.

14. The meeting continued and Senter talked about him calling Rivera the E-billing Manager, Plaintiff told him that it was inappropriate since that was her position. He went on to say that Plaintiff needed to humble herself. Senter discounted Plaintiff's accomplishments and refused to apologize for humiliating her in a public forum. Plaintiff was afraid to pursue the conversation any further in fear of losing her job. Plaintiff believes that her mistreatment was discriminatory in nature due to her being a female African American. Plaintiff also believed that Senter was supporting Wry's discriminatory actions and in consort with her to push Plaintiff out of Dechert.

15.  E-billing supervisor Rivera reported directly to Plaintiff. Plaintiff emailed him requesting that he schedule and provide e-billing training for a temporary biller. Initially he did not reply to the email. Plaintiff noticed his attitude toward her had changed since Rivera's interactions with Wry. Prior to the meeting Plaintiff had a great working relationship with Rivera. A few days later Plaintiff sent a follow up email and he replied that Jason Carroll would be doing the training. Plaintiff specifically requested that Rivera conduct the training since Plaintiff was the manager of the department, she was authorized to make that decision, as it within the scope of her authority. Instead, Wry and Rivera decided, without the Plaintiff, that Carroll would do the training.  This was not what he was instructed to do. Plaintiff reiterated that Rivera was to schedule and conduct the training. Later that week Plaintiff was in a meeting with Wry and a few others, when the meeting ended Wry asked to speak with Plaintiff about the training and she wanted more

information. Plaintiff told her that she wanted Rivera to do the training. Plaintiff specifically requested that Rivera conduct the training and since Plaintiff was the Manager of the Department could make that decision and was hers to make. Wry was clearly trying to undermine her authority because she was African American.

16.   A few weeks after the meeting with Wry, Plaintiff received an invitation to meet with Wry and Senter. They wanted to inform Plaintiff that she would no longer be managing the e-billing department and the department would be reporting directly to Wry. Plaintiff asked why that decision was made but did not receive an answer. Having that department taken from Plaintiff was very embarrassing, as she had been supervising the e-billing department since 2017 and it was clear that this scheme was hatched by Wry to further the racial discrimination.

17.   In June 2019, a conference was held in Orlando Florida. Initially Plaintiff was not invited to attend with the firm. In prior years, the manager of the billing department would attend this conference which included seminars on the firm's soon to be new billing program, Aderant. Wry eventually invited the Plaintiff under the condition that she had to pay for her own registration, flight and hotel which Plaintiff would eventually be reimbursed from the firm.  Plaintiff respectfully declined the opportunity as it was too much money for her to advance. Wry than suggested that the firm pay for the registration and flight on the company card, but Plaintiff had to book the hotel stay for which she would be reimbursed. Plaintiff agreed to go. Plaintiff was the only African American person from Dechert attending the conference and the only one obliged to pay in advance from her own funds. This was yet another example of the disparate treatment of the

Plaintiff by Wry in furtherance of the discriminatory conduct being done by Wry, in consort with Senter and supported by Dechert.

18. As the firm prepared for the migration from Elite to Aderant Plaintiff would attend in office meetings with the Dechert team and the Aderant consultants (AAC). If she asked questions Wry would often cut her off and try to finish her sentence as though she thought Plaintiff could not articulate her thoughts. The times that she was able to get a question out, when AAC would respond Wry would say in the open forum "do you now understand Celiena?" which was humiliating to Plaintiff because it created an impression of incompetency. This treatment was as a result of Wry's ongoing discriminatory actions because Plaintiff was an African American woman.

19. Wry continued to give Plaintiff projects regarding Aderant with very tight deadlines knowing that the billing department was short staffed, and that Plaintiff was spending a great deal of time preparing billing, Plaintiff let Wry know on several occasions that she was being unfairly treated, being over worked with unrealistic deadlines and that she was the only person in billing being treated in such a manner.

20. December 2019 Plaintiffs performance evaluation stated that she "meets expectation" Wry demeaned Plaintiff's efforts and contribution to the firm in the review write up although Plaintiff's efforts were above and beyond.

21. January 30, 2020, Plaintiff emailed Wry because she noticed when the Aderant consultants would talk about billing they would refer to Wry and co-worker Mack as though the Billing Manager was no longer being recognized. Wry demeaned Plaintiff by doing so. Plaintiffs team began questioning her role as department manager, despite Plaintiff's stellar work.  The mistreatment was due to her race.

22. March 16, 2020, Plaintiff, and her team began working remotely due to the pandemic COVID-19. The billers were struggling with their assignment having to work only from their laptops. They did not have at home the equipment sufficient to perform their tasks effectively. Wry expected Plaintiff to assist the billers with their assignment until they received the additional office equipment. Wry made excessive requests for Plaintiff's billing assistance and Plaintiff was overwhelmed with work. Often, Plaintiff stayed up working late nights making sure to meet all deadlines.  No other similarly situated people were required to be overworked by the Firm.

23. Wry contacted Plaintiff to determine if she was maintaining her team's moral during this time. When Wry realized that Plaintiff was meeting with the team without her knowledge she quickly requested to be in attendance.

24. Prior to working remotely, Plaintiff began conducting Aderant billing training and giving assignments to the team. She would travel to the DC and NY offices also to conduct sessions. Plaintiff only made it through one round of training sessions before Wry requested that Mack get involved in the training.  There was no reason for Mack's attendance. Team members had started to questioned Plaintiff as to why Wry and Mack had to attend the training sessions.

25. Plaintiff was the manager of the billing team and was successful with her training, but Wry insisted that Mack conduct the sessions. Wry then requested that Plaintiff put together the training agendas for Mack. A billing member in the NY office was struggling with Aderant billing and specifically requested that the Department Manager Plaintiff provide her with one-on-one Aderant billing training. Wry found out about the struggling biller and called Plaintiff to have Mack do that training. Wry stated that a biller

11

told her that they were afraid to come to Plaintiff for assistance with Aderant for fear of

"retribution". Wry would not let Plaintiff speak with the individual who made the

statement and insisted keep that anonymous. Plaintiff told Wry that this issue should be

raised with HR because the allegations were very seriously. Wry quickly changed the

story and said, "maybe the word retribution wasn't used" Wry then said the biller

probably felt uncomfortable because they did not want Plaintiff to know that they were

not catching on to the Aderant billing. Wry said there was no need to involve HR. That

conversation made Plaintiff feel very uneasy, Wry had yet again resorted to embellishing

and trying to intimidate Plaintiff. Wry continued with the conversation as though she had

never made false claim against Plaintiff and took no thought to Plaintiff feelings

regarding what she said, or how Plaintiff was affected by it.

26. Prior to becoming the manager of the billing department during recruitment Plaintiff

would interview a candidate in her role as supervisor, followed by the manager's

interview, but when Plaintiff became the manager this all changed. Plaintiff would

interview a candidate and then Wry would interview them as well. It was as though

Plaintiff was still the supervisor and Wry the manager. They discussed feedback but Wry

made the final decisions and worked with HR. Although Plaintiff held the title Billing

Manager, she was never allowed the authority prior Billing Managers had, Wry clearly

managed the billing department and expressed dominance over Plaintiff at every

opportunity presented. Wry decided what authority was to be given to Plaintiff which was

very limited. Plaintiff believes she was under such limitations and scrutiny because of

Wry's opinion of Plaintiff as an African American person.

27. In or around July 2020 against Plaintiff's better judgement, Wry made the decision to hire Goodger for the Billing Coordinator position in the DC office; Wry unfairly blamed Plaintiff for the resignation of Goodger and used it to negatively influence Plaintiff's mid-year review. Wry was motivation for blaming Plaintiff was due to Plaintiff being African American.

28. August 2020 Plaintiff reported Wry's harassment to Fico (Director, US Human Resources). Fico took notes and mentioned doing an investigation. At the scheduled meeting, instead of Fico being impartial as a representative of the Human Resource department, Fico showed bias toward Plaintiff and supported Wry by defending Wry's obvious discriminatory conduct.

29. August 2020 Fico referred Plaintiff to Arokium (Director, Diversity, and Inclusion). Arokium provides support to employees that have been discriminated against within the firm. Plaintiff met with Arokium disclosing harassment from Wry. Arokium took some notes and mentioned doing an investigation. Arokium never followed up with Plaintiff.

30. October 2020 Wry scheduled Plaintiff mid-year review which included inaccurate accounts and falsified information in an effort to demean Plaintiff's performance to prohibit Plaintiff's continued growth and upward mobility within the firm.

31. December 2020 Plaintiff could no longer tolerate the harassment from Wry and decided to resign, thus being constructively discharged.

32. Plaintiff took necessary measures to bring awareness to the harassment and bias experienced by Wry by reporting Wry's conduct to the firm's Human Resource Department per firm policy, which there was no investigation, interference, or consequence for Wry's actions and conduct.

33. The above is just some of the examples of unlawful discrimination, harassment, and retaliation to which the Defendants subjected the Plaintiff on a continuous and ongoing basis throughout Plaintiff's employment.

34. Plaintiff claims that the named Respondents unlawfully harassed, retaliated, and discriminated against Plaintiff on the basis of Plaintiff's opposition to their unlawful employment practices.

35. Plaintiff claims a continuous practice of discrimination and claims a continuing violation and makes all claims herein under the continuing violations doctrine.

36. At all times material, Plaintiff opposed the discriminatory, harassing, and retaliatory conduct of the named Respondents, and made good-faith efforts to take corrective action the through the channels available to her as an employee of Respondent DECHERT LLP.

37. At all times material, Plaintiff endured the discriminatory, harassing, and retaliatory conduct of the named Respondents as conditions of her continued employment with Respondents DECHERT LLP.

**FIRST COUNT**
**FOR DISCRIMINATION UNDER TITLE VII**
**AGAINST DEFENDANT DECHERT. LLP**

27. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

28. Title VII states in relevant parts as follows: § 2000e-2. [Section 703](a) Employer Practices It shall be an unlawful employment practice for an employer – (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."

14

29.     Defendant, DECHERT, LLP engaged in unlawful employment practices prohibited by 42 U.S.C. § 2000e et seq., by discriminating against Plaintiff because of his race and color.

**SECOND COUNT**
**FOR DISCRIMINATION UNDER TITLE VII**
**AGAINST DEFENDANT DECHERT, LLP**

30.     Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

31.     Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. $2000e-3(a) provides that it shall be unlawful employment practice for an employer:

32.     "(1) to … discriminate against any of his employees … because [s]he has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

33.     Defendant, DECHERT, LLP retaliated against Plaintiff because he opposed and reported Defendants' unlawful employment practices.

**THIRD COUNT**
**FOR DISCRIMINATION**
**UNDER STATE LAW**
**AGAINST ALL DEFENDANTS**

34.     Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

35.     The PHRA § 955 provides that  it shall be an unlawful discriminatory practice: "(a) For any employer because of the race, color, religious creed, ancestry, age, sex, national origin or non-job related handicap or disability or the use of a guide or support animal because of the blindness, deafness or physical handicap of any individual or independent contractor, to

refuse to hire or employ or contract with, or to bar or to discharge from employment such individual or independent contractor, or to otherwise discriminate against such individual or independent contractor with respect to compensation, hire, tenure, terms, conditions or privileges of employment or contract, if the individual or independent contractor is the best able and most competent to perform the services  required."

36.     Defendants engaged in an unlawful discriminatory practice by discriminating against the Plaintiff because of her race and color.

37.     Plaintiff hereby states her claim against Defendants under all of the applicable paragraphs of the PHRA § 955.

**FOURTH COUNT**
**FOR RETALIATION**
**UNDER STATE LAW**
**AGAINST ALL DEFENDANTS**

38.     Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

39.     PHRA § 955(d) provides that it shall be an unlawful discriminatory practice: " For any person, employer, employment agency or labor organization to discriminate in any manner against any individual because such individual has opposed any practice forbidden by this act, or because such individual has made a charge, testified or assisted, in any manner, in any investigation, proceeding or hearing under this act."

40.     Defendants engaged in an unlawful discriminatory practice by discharging, retaliating, and otherwise discriminating against the Plaintiff because of Plaintiff's opposition to the unlawful employment practices of his employer.

**FIFTH COUNT**
**FOR AIDING & ABETTING**
**UNDER STATE LAW**
**AGAINST ALL DEFENDANTS**

41.     Plaintiff repeats and realleges each and every allegation made in the above

paragraphs of  this complaint.

42.     PHRA § 955(e) provides that it shall be an unlawful discriminatory practice: " For

any person, employer, employment agency, labor organization or employee, to aid, abet, incite,

compel or coerce the doing of any act declared by this section to be an unlawful discriminatory

practice, or to obstruct or prevent any person from complying with the provisions of this act or

any order issued thereunder, or to attempt, directly or indirectly, to commit any act declared by

this section to be an unlawful discriminatory practice."

43.     Defendants engaged in an unlawful discriminatory practice in violation of PHRA

§955(e)  by aiding, abetting, inciting, compelling, and coercing the discriminatory conduct.

**SIXTH COUNT**
**DISCRIMINATION UNDER THE PHILADELPHIA**
**CITY ADMINISTRATIVE ORDINANCE AGAINST ALL DEFENDANTS**

44.     Plaintiff repeats and realleges each and every allegation made in the above

paragraphs of this complaint.

45.     The Philadelphia Fair Practices Ordinance § 9-1103(1) provides that "It shall be

an unlawful discriminatory practice:  "It shall be an unlawful employment practice to deny or

interfere with the employment opportunities of an individual based upon his or her race,

ethnicity, color, sex (including pregnancy, childbirth, or a related medical condition), sexual

orientation, gender identity, religion, national origin, ancestry, age, disability, marital status,

familial status, genetic information, or domestic or sexual violence victim status, including, but

not limited to, the following: (a) For any employer to refuse to hire, discharge, or otherwise

discriminate against any individual, with respect to tenure, promotions, terms, conditions or privileges of employment or with respect to any matter directly or indirectly related to employment."

46.     Defendants engaged in an unlawful discriminatory practice in violation of Philadelphia Fair Practices Ordinance § 9-1103(1) by creating and maintaining discriminatory working conditions, and otherwise discriminating against Stone because of Stone's race and color.

47.     Plaintiff hereby makes a claim against Defendants under all the applicable paragraphs of Philadelphia Fair Practices Ordinance Chapter 9-1100.

**SEVENTH COUNT**
**DISCRIMINATION UNDER THE PHILADELPHIA**
**CITY ADMINISTRATIVE ORDINANCE**
**AGAINST ALL DEFENDANTS**

48.     Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

49.     The Philadelphia Fair Practices Ordinance § 9-1103(1)(g) provides that it shall be unlawful discriminatory practice: " For any person to harass, threaten, harm, damage, or otherwise penalize, retaliate or discriminate in any manner against any person because he, she or it has complied with the provisions of this Chapter, exercised his, her or its rights under this Chapter, enjoyed the benefits of this Chapter, or made a charge, testified or assisted in any manner in any investigation, proceeding or hearing hereunder"

50.     Defendants engaged in an unlawful discriminatory practice in violation of Philadelphia Fair Practices Ordinance § 9-1103(1)(g) by discriminating against the Plaintiff because of Plaintiff's opposition to the unlawful employment practices of Plaintiff's employer.

**EIGHTH COUNT**
**DISCRIMINATION UNDER THE PHILADELPHIA**
**CITY ADMINISTRATIVE ORDINANCE**
**AGAINST ALL DEFENDANTS**

51.     Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

52.     The Philadelphia Fair Practices Ordinance § 9-1103(1)(h) provides that it shall be unlawful discriminatory practice: "For any person to aid, abet, incite, induce, compel or coerce the doing of any unlawful employment practice or to obstruct or prevent any person from complying with the provisions of this Section or any order issued hereunder or to attempt directly or indirectly to commit any act declared by this Section to be an unlawful employment practice."

53.     Defendants engaged in an unlawful discriminatory practice in violation of Philadelphia Fair Practices Ordinance § 9-1103(1)(h) by aiding, abetting, inciting, compelling and coercing the above discriminatory, unlawful and retaliatory conduct.


**NINTH COUNT**
**Hostile Work Environment and Harassment**
**Civil Rights Act of 1964, 42 U.S.C. §2000e et. seq.**
**AGAINST DEFENDANT DECHERT, LLP**

54.     Plaintiff incorporates by refence the foregoing paragraphs as if set forth at length herein.

55.     Defendants are an employer under 42 U.S.C. §2000 et seq as they engage in an industry affecting commerce and have 15 or more employees for each working day of 20 or more calendar weeks in the current or preceding calendar year.

19

56.     Plaintiff is a person and has a protected class in being African American.

57.     Under 42 U.S.C.§2000e-2 it shall be unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin.

58.     Defendant by and through Plaintiff's supervisors made remarks about Plaintiff, treated Plaintiff disparately by way of conduct motivated by discriminatory animus as set forth in the Material Facts which have been incorporated into this Cause of Action.

59.     The disparate treatment was clearly discriminatory based upon race and color.

60.     The disparate treatment caused a hostile work environment for Plaintiff as the treatment had an actionable impact on Plaintiff's ability to work.

61.     Plaintiff's complaints about his treatment were reported to his supervisors and in accordance with the Defendants procedures.

62.     Defendant failed to address Plaintiff's complaints of discrimination fairly and properly.

63.     As a direct and proximate result of Defendant's discrimination, Plaintiff has suffered loss of wages including loss of back pay, loss of front pay, loss of amenities of employment, out of pocket expenses, emotional damages, pain and suffering, alienation, loss of confidence, loss of reputation, and other similar damages and harms, all to Stone's great detriment.

64.     Defendant's actions were willful and wanton and thus require imposition of Punitive Damages.

20

**TENTH COUNT**
**DISPARATE TREATMENT**
**CIVIL RIGHTS ACT OF 1964, 42 U.S.C.§2000e et. seq.**
**AGAINST ALL DEFENDANTS**

65.     Plaintiff incorporates by reference the foregoing paragraphs as set forth at length herein.

66.     Defendants discriminated and disparately treated Plaintiff, by and through its officers, managers, and supervisors as follows:

a.     Disparate discipline.

b.     Disparate scheduling.

c.     Disparate training and pay.

d.     Constructive discharge

e.     Disparate criticism of work performance where similarly situated non-African Americans were not subject to the same, and

f.     Other treatment that was wrongful and disparate on the base of race/color.

67.     As a direct and proximate result of Defendants discrimination, Plaintiff has suffered loss of wages including loss of back pay, loss of front pay, loss of amenities of employment, out of pocket expenses, emotional damages, pain and suffering, alienation, loss of confidence, loss of reputation, and other similar damages and harms, all to Plaintiff's great detriment.

68.     Defendants, actions were willful and wanton and thus require imposition of Punitive Damages.

69.     Alternatively, as Defendants considered Plaintiff 's race in the foregoing discrimination, Plaintiff is entitled to a charge of mixed-motive discrimination, which entitles Plaintiff to an award of Attorney's fees.

## ELEVENTH COUNT
## RETALIATION
## Civil Rights Act of 1964, 42 U.S.C.§200e et. seq.
## AGAINST DEFENDANT DECHERT, LLP

70.     Plaintiff incorporates the foregoing paragraphs as if set forth at length herein.

71.     Defendant DECHERT retaliated against Plaintiff for making a complaint of discrimination.

72.     The temporal proximity between Plaintiff's complaint and termination raises an inference that the termination was retaliation, such that no further evidence of retaliation is necessary.

73.     As a direct and proximate cause of Defendant's discrimination, Plaintiff suffered loss of wages including loss of back pay, loss of front pay, loss of amenities of employment, out of pocket expenses, emotional damages and harms, all of Plaintiff's great detriment.

74.     Defendants' actions were willful and wanton and thus require the imposition of Punitive Damages.

75.     Defendants considered Plaintiff's protected class in deciding to disparately treat and/or terminate Plaintiff resulting in mixed-motive discrimination/retaliation, which entitles Plaintiff to an award of attorney's fees.

## TWELFTH COUNT
## Discrimination, Disparate Treatment, Hostile Work Environment, Retaliation
## Pennsylvania Human Relations Act, 43 P.S. §951 et. seq.
## AGAINST ALL DEFENDANTS

76.     Plaintiff incorporates the foregoing paragraphs as if set forth at length herein.

77.     Defendant DECHERT is an employer under the Pennsylvania Human Relations Act as it employs citizens of the Commonwealth of Pennsylvania and because Defendant DECHERT resides in Pennsylvania.

78.     Plaintiff is protected under the Pennsylvania Human Relations Act and has the protected class of being African American (race) and color (black).

79.     Defendant subjected Plaintiff to harassing, hostile work environment, disparately treated Stone, retaliated against Plaintiff and otherwise discriminated against Plaintiff, all on the basis of race and color as alleged.

80.     As a direct and proximate cause of Defendant's discrimination, Plaintiff has suffered loss of wages including loss of back pay, loss of front pay, loss of amenities of employment, out of pocket expenses, emotional damages, pain and suffering, alienation, loss of confidence, loss of reputation, and other similar damages and harm, all to Stone's great detriment.

81.     Plaintiff seeks attorney's fees under the Pennsylvania Human Relations Act.

### THIRTEENTH COUNT
### Vicarious Liability
### AGAINST DEFENDANT DECHERT

82.     At all times material, Defendant DECHERT employed all other individual Defendants named in this matter.  DECHERT is vicariously liable for all of the actions of the individual Defendants as well as any other employees who may have contributed to the harm caused by the discrimination hereinbefore described.

### AS A FOURTEENTH CAUSE OF ACTION
### FOR DISCRIMINATION UNDER 42 U.S. CODE § 1981
### (AGAINST ALL DEFENDANTS)

83. 42 U.S. Code § 1981 - Equal rights under the law states provides:

(a)     All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property

as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes,
licenses, and exactions of every kind, and to no other.

(b)    For purposes of this section, the term "make and enforce contracts" includes the
making, performance, modification, and termination of contracts, and the enjoyment of all
benefits, privileges, terms, and conditions of the contractual relationship.

(c)    The rights protected by this section are protected against impairment by
nongovernmental discrimination and impairment under color of State law.

1.    Defendants constantly enforced a purposefully discriminatory pattern and practice
of depriving African-American individuals of the equal rights described therein, in further
violation of 42 U.S.C. §1981.

2.    As a result of Defendants' discrimination in violation of Section 1981, Plaintiff
has been denied the enjoyment of all benefits, privileges, terms, and conditions of Plaintiff's
contractual relationship which provided substantial compensation and benefits, thereby entitling
him to injunctive and equitable monetary relief; and having suffered such anguish, humiliation,
distress, inconvenience and loss of enjoyment of life because of Defendants' actions, thereby
entitling Plaintiff to compensatory damages.

3.    As alleged above, Defendants acted with malice or reckless indifference to the
rights of the Plaintiff and copious other individuals named herein, thereby entitling Plaintiff to an
award of punitive damages.

4.    Defendants violated the above and Plaintiff suffered numerous damages as a
result.

5.    Plaintiff makes a claim against Defendants under all of the applicable paragraphs
of 42 U.S. Code § 1981.

6.      Plaintiff claims Defendants both unlawfully discriminated against Plaintiff and unlawfully retaliated against Plaintiff in violated of 42 USC 1981.

## JURY DEMAND

Plaintiff requests a jury trial on all issues to be tried.

## PRAYER FOR RELIEF

**WHEREFORE**, Stone demands judgment against Defendants, jointly, severally, or in the alternative in an amount to be determined at the time of trial plus interest, including but not limited to all emotional distress and back pay and front pay, punitive damages, liquidated damages, statutory damages, attorneys' fees, costs, and disbursements of action; and for such other relief as the Court deems just and proper.

Date: June 7, 2021                          **DEREK SMITH LAW GROUP, PLLC**

By: _____
    Scott E. Diamond, Esq.
    1835 Market Street, Suite 2950
    Philadelphia, Pennsylvania 19103
    Phone: (215) 391-4790
    scott@dereksmithlaw.com
    *Attorneys for Plaintiff, Celiena McClelland*