# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| | : | |
| | : | CIVIL ACTION |
| **CELIENA MCCLELLAND,** | : | |
| *Plaintiff,* | : | |
| | : | |
| **v.** | : | No.   **21-2702** |
| | : | |
| **DECHERT, LLP,** *et al,* | : | |
| *Defendants.* | : | |

## <u>MEMORANDUM</u>

Kenney, J.                                                      June 10, 2022

Before the Court is Defendants' Motion for Summary Judgment against Plaintiff Celiena McClelland. ECF No. 24.

### I.   BACKGROUND

Ms. McClelland brings this civil suit against her former employer Dechert, LLP, and supervisor Elaine Wry alleging employment discrimination, hostile work environment, and retaliation. ECF No. 2. Ms. McClelland is an African-American woman, who worked in the billing department at Dechert. *Id*. Ms. Wry is an employee at Dechert who, at all times relevant to this matter, held supervisory authority over Ms. McClelland as Director of Financial Operation. ECF No. 2 ¶¶ 1-5. Ms. McClelland describes Ms. Wry as Asian. ECF No. 2 ¶ 5.

Ms. McClelland began her employment with Dechert's billing department in or around 2000 and submitted her resignation in December 2020 but Ms. McClelland claims that she was constructively discharged due to racial discrimination and harassment. ECF No. 2 ¶¶ 1-2. Ms. McClelland alleges that the issues began in February 2019. *Id*. ¶ 3. Ms. McClelland describes

Ms. Wry as an "extreme micromanager" who gave her "unrealistic deadlines and an excessive workload." *Id.* ¶¶ 3-4, 19. Ms. McClelland alleges that Ms. Wry contacted employees in the billing department to ask them questions about her. *Id.* ¶ 5. Ms. Wry also allegedly requested years of exit interviews from the billing department to analyze. *Id.* ¶ 6. On May 16, 2019, Ms. McClelland claims that she was accused by Ms. Wry and an employee in Human Resources for the high turnover rate in the billing department and that others had complained of Ms. McClelland's communication skills. *Id.* Ms. McClelland claims this was "an effort to undermine her credibility and performance" at Dechert. *Id.*

On April 1, 2019, Ms. McClelland claims that she was involved in a conference call with a client, where most individuals were announced on the call except for herself and one other employee. *Id.* ¶ 10. Ms. McClelland admits to being visibly upset after the call. *Id.* When Ms. Wry wished to discuss it, Ms. McClelland told her that another employee improperly introduced someone as the e-billing manager even though that is her role. *Id.* ¶ 12. When that employee met with Ms. McClelland to discuss the conference call, he allegedly "refused to apologize for humiliating her in a public forum" and told her she "needed to humble herself." *Id.* ¶ 14. She also claims that she was reprimanded for leaving for a funeral that day, though she had notified Ms. Wry of it in advance. *Id.* ¶¶ 11, 13.

According to Ms. McClelland, at some point in the Spring of 2019, Ms. Wry and Dechert's CFO, Mr. Senter, informed Ms. McClelland that she would no longer be managing the e-billing department and that Ms. Wry would take over the role. *Id.* ¶ 16. Ms. McClelland called the decision "very embarrassing[.]" *Id.* ¶ 16. Later in June 2019, Ms. Wry invited Ms. McClelland to attend a conference in Orlando, Florida but she had to buy her registration, flight and hotel then seek reimbursement from Dechert. *Id.* ¶ 17. Ms. McClelland declined due to the

expense and Ms. Wry offered to have the firm pay for the registration and flight, though Ms. McClelland would still need to advance the payment for her hotel stay. *Id*. Ms. McClelland then agreed to attend. *Id*. She alleges that she was the only African American employee from Dechert attending and the only employee required to advance the payment. *Id*.

In her December 2019 performance review, Ms. McClelland claims that Ms. Wry said she "meets expectation," even though Ms. McClelland believes that her efforts were above and beyond. *Id*. ¶ 20. In January 2020, Ms. McClelland complained to Ms. Wry that third-party vendor consultants would mention only Ms. Wry and another co-worker, which ignored her as the billing manager. *Id*. ¶ 21. In March 2020, Ms. McClelland and her team switched to remote work due to the Covid-19 pandemic. *Id*. ¶ 22. Ms. McClelland claims she was "overwhelmed with work" and that Ms. Wry made "excessive requests" that made Ms. McClelland work late nights. *Id.* Ms. McClelland alleges that no other similarly situated person at Dechert was "required to be overworked" like her. *Id*. Ms. Wry also allegedly requested to be included in team meetings. *Id*. ¶ 23.

In or around July 2020, Ms. Wry allegedly hired a billing coordinator against Ms. McClelland's advice and then blamed Ms. McClelland when he resigned from the position. *Id*. ¶ 27. Ms. McClelland lists a number of other complaints, including staffing disagreements in e-billing, training of new billers, being "cut off" during meetings, being forced to share training session responsibilities with a co-worker, and being forced to share hiring responsibilities with Ms. Wry. *Id.* ¶¶ 8-9, 15, 18, 25, 26.

In August 2020, Ms. McClelland reported Ms. Wry's behavior to the Director of Human Resources. *Id*. ¶ 28.[1] Ms. McClelland claims that the Director of Human Resources was not impartial and showed bias against her. *Id*. Human Resources referred her to the Director of Diversity and Inclusion, who Ms. McClelland met with and she claims never followed up. *Id*. ¶ 29. At her mid-year review in October 2020, Ms. McClelland alleges that her evaluation was filled with inaccurate and false information, though she does not elaborate on what information was inaccurate or false. *Id*. ¶ 30. In December 2020, Ms. McClelland resigned from her employment at Dechert. *Id*. ¶ 31.

Based on the evidence on the record, Defendants submitted a Statement of Stipulated Material Facts for the purposes of summary judgment. ECF No. 25. Ms. Wry, an Asian-American woman employed by Dechert, was promoted to Director of Financial Operations in January 2019. ECF No. 25 ¶ 5. Shortly thereafter, Ms. McClelland was promoted to Billing Manager in February 2019. ECF No. 25 ¶ 1. Ms. Wry informed Ms. McClelland of the promotion and increased salary of $92,000. ECF No. 25 ¶ 9. Ms. McClelland requested an increase in the starting salary to $96,000, which Ms. Wry secured for her. ECF No. 25 ¶¶ 10-11.

In March 2019, half of the billing assistants in the Philadelphia office resigned. ECF No. 25 ¶ 17. Dechert's CFO and Ms. Wry collected five years of exit interviews from Human Resources for everyone who left the billing department. ECF No. 25 ¶ 19. In May 2019, Ms. McClelland, Ms. Wry and a Manager from Human Resources met to discuss attrition in the billing department. ECF No. 25 ¶ 22. Ms. McClelland testified in her deposition that she felt discriminated against during that meeting but race never came up during the conversation, nor

---

[1] The Court notes that due to a typographical error, Plaintiff's Amended Complaint uses the numbering for paragraphs 27 to 37 twice. All citations within this section refer to the first use of those paragraph numbers.

did Ms. McClelland report this discrimination to Ms. Wry or anyone at Dechert at that time. ECF No. 25 ¶¶ 22-23.

During a conference call with a client in April 2019, the CFO referred to another employee as the e-Billing "Manager." ECF No. 25 ¶ 24.  Ms. Wry, noticing that Ms. McClelland was upset after the call, helped arrange a meeting between Ms. McClelland and Dechert's CFO, where the CFO told Ms. McClelland it was unintentional if he misspoke. ECF No. 25 ¶ 26.

Regarding Ms. McClelland's issues with travel expenses related to the June conference, Dechert's Travel and Entertainment Expense Policy specifies that "[t]he firm will reimburse [employees] for business related transportation and entertainment expenses." ECF No. 25 ¶ 15. Ms. McClelland admits that Ms. Wry was able to get approval for an exception of that policy when Ms. McClelland stated an inability to afford the expenses. ECF No. 25 ¶ 16.

As Billing Manager, Ms. McClelland expressed that she "felt as though [she] was drowning." ECF No. 25 ¶ 29. To alleviate the burden, Ms. Wry hired a billing supervisor in August 2019. ECF No. 25 ¶ 32. Ms. Wry also restructured the chain of command in the billing/e-billing department and Ms. McClelland was not consulted about these changes. ECF No. 25 ¶ 33.

In Ms. McClelland's 2019 performance review, Ms. Wry gave her ratings of either "exceeds expectations" or "meets expectations" and included statements like "I commend Celiena for her efforts" and "I look forward to seeing Celiena continue to grow and develop further in her position as Billing Manager." ECF No. 25 ¶¶ 37, 41. Ms. McClelland's self-evaluation did not include any accusations of harassment or racial discrimination. ECF No. 25 ¶ 40. Following the 2019 performance review, Dechert gave Ms. McClelland a salary increase to $99,000. ECF No. 25 ¶ 42.

At the beginning of 2020, Dechert began preparing for a switch from their current billing system to Aderant and assigned the Manager of Accounts Payable as the full-time staff member overseeing the project. ECF No. 25 ¶ 44. The Manager of Accounts Payable fulfilled this role on the project for all departments, not just billing. ECF No. 29 at 47. Ms. McClelland expressed concern that another employee only referred to Ms. Wry and this other manager while discussing the transition, which "demeans" her position, and that her "presence as manager [was] not being recognized." ECF No. 25 ¶ 45. Ms. McClelland admits she did not think those communications were racially-biased. ECF No. 25 ¶ 46. Ms. Wry responded that she would discuss the issue and make sure Ms. McClelland was being addressed in future communications. ECF No. 25 ¶ 45. In additional correspondence, Ms. Wry states that Ms. McClelland is "the only one who constantly pushes back" on this Manager's involvement in the project. ECF No. 29 at 47.

In January 2020, Ms. McClelland expressed concerns regarding Ms. Wry having bias against her and not being supportive. ECF No. 29 at 51. Human Resources attempted to schedule a meeting with Ms. Wry and Ms. McClelland but Ms. McClelland declined the meeting offer and stated she did not want anything done. ECF No. 29 at 51.

In June 2020, an Assistant Biller reporting to Ms. McClelland for a few weeks resigned from her position, stating during her exit interview that Ms. McClelland's communication style contributed to her decision to leave. ECF No. 25 ¶ 48. In July 2020, Ms. Wry and a Human Resources Manager, who is an African-American woman, met with Ms. McClelland to discuss the resignation. ECF No. 25 ¶ 49. Ms. McClelland was never disciplined by either Ms. Wry or Human Resources. ECF No. 25 ¶ 51. Ms. McClelland complained to Human Resources about the meeting but did not mention discrimination or harassment. ECF No. 25 ¶ 50. Human Resources spoke with Ms. McClelland about her complaint and then spoke to Ms. Wry and Ms.

Wry's supervisor. ECF No. 25 ¶ 52. Human Resources then arranged a meeting between Ms. McClelland, Ms. Wry and that Human Resources Manager to address the complaint, though Ms. McClelland was "disappointed" in the response. ECF No. 25 ¶¶ 54-55. Human Resources continued to follow up with Ms. McClelland. ECF No. 25 ¶ 57. In or around July 2020, Dechert hired and paid for an executive coach for Ms. McClelland. ECF No. 25 ¶ 58. The Director of Human Resources told Ms. McClelland that "the firm is investing in your development as a manager and hope that you will engage and embrace this opportunity as it is intended for development […] we value your hard work and dedication and look forward to your continued growth and development as a manger." ECF No. 29 at 50. After approximately one month of working together, Ms. McClelland chose to end the coaching sessions because she did not have enough time for it. ECF No. 25 ¶¶ 59-60.

In Ms. McClelland's 2020 mid-year evaluation, Ms. Wry noted that Ms. McClelland needed to work on her communication and collaboration skills. ECF No. 25 ¶ 61. Ms. McClelland testified at her deposition that she did not feel that feedback was racially motivated. ECF No. 25 ¶ 61. Ms. Wry also called Ms. McClelland "a very hard worker" and expressed interest in her growth at the firm. ECF No. 25 ¶¶ 62-63.

In December 2020, Ms. McClelland resigned after two years as Billing Manager and twenty years at Dechert. ECF No. 25 ¶¶ 67-68. She did not mention any racial discrimination in her resignation letter. ECF No. 25 ¶ 69; ECF No. 29 at 53. During her exit interview, Ms. McClelland alleged racial discrimination. ECF No. 25 ¶ 70. Ms. McClelland had previously alleged bias against Ms. Wry at some point in 2019 and in January 2020, though there is no evidence that Ms. McClelland pursued those claims or followed up with Human Resources at that time. ECF No. 25 ¶ 71. Ms. McClelland testified at deposition that Ms. Wry was aware of

her allegations of racial bias and harassment even though Ms. McClelland had not put her allegations in writing. ECF No. 25 ¶¶ 72-73. Ms. Wry claims that she was unaware of the allegation of racial discrimination until after Ms. McClelland's departure. ECF No. 25 ¶ 74.

## II.    PROCEDURAL HISTORY

On June 18, 2021, Ms. McClelland filed an Amended Complaint against Dechert and Ms. Wry bringing claims as follows: Count 1 for Discrimination under Title VII against Dechert; Count 2 for Discrimination under Title VII against Dechert; Count 3 for Discrimination under the PHRA against Dechert and Ms. Wry; Count 4 for Retaliation under the PHRA against Dechert and Ms. Wry; Count 5 for Aiding and Abetting under the PHRA against Dechert and Ms. Wry; Count 6 for Discrimination under the PFPO against Dechert and Ms. Wry; Count 7 for Discrimination under the PFPO against Dechert and Ms. Wry; Count 8 for Discrimination under the PFPO against Dechert and Ms. Wry; Count 9 for Hostile Work Environment and Harassment under 42 U.S.C. §2000 against Dechert; Count 10 for Disparate Treatment under 42 U.S.C. §2000 against Dechert and Ms. Wry; Count 11 for Retaliation under 42 U.S.C. §2000 against Dechert; Count 12 for Discrimination, Disparate Treatment, Hostile Work Environment, and Retaliation under the PHRA against Dechert and Ms. Wry; Count 13 for Vicarious Liability against Dechert; Count 14 for Discrimination under 42 U.S.C. § 1981 against Dechert and Ms. Wry. ECF No. 2. Parties later stipulated to strike Counts 10, 11, and 12. ECF No. 28.

Now Defendants Dechert and Ms. Wry move for summary judgment on all remaining claims. ECF No. 24. First, Defendants contend that Ms. McClelland was not constructively discharged because, among other reasons, Ms. McClelland was promoted, given increased pay,

and received positive performance evaluations. ECF No. 24 at 15-17. Defendants also contend that there is insufficient evidence to establish a hostile work environment because Ms. McClelland fails to prove severe and pervasive hostility that interfered with the nature of her employment. ECF No. 24 at 18-21. In addition, Defendants assert that there is no evidence of retaliation against Ms. McClelland. ECF No. 24 at 21-23. Finally, since Ms. McClelland's claims of discrimination fail against Dechert, Defendants assert that Ms. McClelland does not have any basis for individual liability against Ms. Wry. ECF No. 24 at 23-25.

Ms. McClelland responds that she suffered an adverse employment action of constructive discharge because she was "overworked and overwhelmed" due to her race. ECF No. 29 at 14-15. Ms. McClelland reiterates that she was constructively discharged by Ms. Wry's criticism, lack of respect, and mistreatment. ECF No. 29 at 16. Ms. McClelland also contends that she suffered retaliation when Dechert provided her with "extensive leadership training" and failed to "conduct a meaningful investigation" of her complaints. ECF No. 29 at 18. In addition, Ms. McClelland contends that she suffered harassment and hostile work environment through "at least nine examples" of conduct, identified by Ms. McClelland in a self-serving declaration dated May 12, 2022, and that Ms. Wry accused her of being unprofessional. ECF No. 29 at 19-21, 39. Finally, Ms. McClelland responds that there is a basis for individual liability against Ms.Wry.

Defendants' reply reiterates many of its arguments from the Motion for Summary Judgment, contending that Ms. McClelland cannot rely on her subjective beliefs absent evidence of racially discriminatory action. ECF No. 30 at 3-7. Defendants contend that, even if Ms. McClelland's allegations are true, they are not sufficient to show severe or pervasive conditions that created an abusive working environment. ECF No. 30 at 7. Therefore, Defendants contend they are entitled to summary judgment on all counts.

## III.    LEGAL STANDARD

Summary judgment is granted where the moving party has established "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported summary judgment motion; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A material fact is one that "might affect the outcome of the suit under governing law[.]" *Id.* at 248.

When deciding a motion for summary judgment, the Court considers the facts in the light most favorable to the nonmoving party and draws all reasonable inferences in the nonmoving party's favor. *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 538 (3d Cir. 2006). The judge's role is not to weigh the disputed evidence and determine the truth of the matter, or to make credibility determinations; rather the court must determine whether there is a genuine issue for trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Anderson*, 477 U.S. at 249. While the moving party bears the initial burden of showing the absence of a genuine issue of material fact, in a case where the non-moving party is the plaintiff—who bears the burden of proof—the non-moving party must, by affidavits or by the depositions and admissions on file, "make a showing sufficient to establish the existence of [every] element essential to that party's case[.]" *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986).

Ultimately, the question at summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251–52.

## IV.   DISCUSSION

### A.  Race Discrimination

"Title VII makes it unlawful for an employer to discharge or 'otherwise discriminate against any individual with respect to [her] compensation, terms, conditions or privileges of employment because of such individual's race, color, religion, sex, or national origin.'" *Larochelle v. Wilmac Corp.*, 210 F. Supp. 3d 658, 677 (E.D. Pa. 2016), *clarified on denial of reconsideration,* 2016 WL 6135577 (E.D. Pa. Oct. 21, 2016), *aff'd,* 769 F. App'x 57 (3d Cir. 2019), and *aff'd,* 769 F. App'x 57 (3d Cir. 2019) (quoting 42 U.S.C. § 2000e–2(a)).[2]

In their Motion for Summary Judgment, Defendants contend first that there is no direct evidence of racial discrimination and, accordingly, Ms. McClelland's claims should be evaluated under the three-step burden shifting inquiry from *McDonnell Douglas*. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973). ECF No. 24 at 12. Based on the allegations laid out in the Amended Complaint, there is no dispute that Ms. McClelland was not subject to any racial commentary while employed at Dechert. ECF No. 24 at 8. Ms. McClelland makes no assertions of any race-based derogatory comments or language directed towards her or any other employee at Dechert. As there is no "overt or explicit evidence" showing racial discrimination,

---

[2] In the employment discrimination context, the analysis for adjudicating claims under the state law PHRA and the city ordinance PFPO is identical to a Title VII analysis. *See Scheidemantle v. Slippery Rock Univ.*, 470 F.3d 535, 539 n. 5 (3d Cir.2006); *see also Dici v. Pennsylvania*, 91 F.3d 542, 552 (3d Cir. 1996) ("[T]he PHRA is applied in accordance with Title VII."); *Joseph v. Cont'l Airlines Inc.*, 126 F. Supp. 2d 373, 376 n.3 (E.D. Pa. 2000) (noting PFPO claims "are analyzed in the same manner" as Title VII claims).

the Court agrees that the burden shifting inquiry is the appropriate test.[3] *Samuel v. Target Realty, LLC*, 2021 WL 4774858, at *6 (E.D.Pa. Oct. 13, 2021) (internal citations omitted).

Courts apply the same burden-shifting framework to discrimination claims asserted under Title VII, the PHRA, and PFPO. *See Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410 (3d Cir. 1999).[4] "[T]he plaintiff always bears the ultimate burden of persuading the trier of fact that the employer intentionally discriminated against plaintiff." *Tomaszewski v. City of Philadelphia*, 460 F. Supp. 3d 577, 593 (E.D. Pa. 2020), *appeal dismissed*, 2020 WL 7366324 (3d Cir. Aug. 5, 2020) (citing *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 799 n.10 (3d Cir. 2003)).

"The *McDonnell Douglas* framework requires that the plaintiff first establish a *prima facie* case of discrimination or retaliation. If the plaintiff successfully meets the requirements of a *prima facie* case, the burden then shifts to the employer to articulate a legitimate, nonretaliatory or nondiscriminatory reason for its actions. If the employer produces such a reason, the burden then shifts back to the plaintiff to prove that the employer's nonretaliatory or nondiscriminatory explanation is merely a pretext for the discrimination or retaliation." *Tourtellotte v. Eli Lilly & Co.*, 636 F. App'x 831, 842 (3d Cir. 2016) (citing *McDonnell Douglas Corp.*, 411 U.S. at 802–04). First, "[t]o establish a *prima facie* case of race or sex discrimination under either the federal or state statute, a plaintiff must first establish that: (1) she is a member of a protected class; (2)

---

[3] Defendants identify multiple occasions in Ms. McClelland's deposition where she admitted there were no overt actions, derogatory remarks, or any words or actions that could be seen as overtly racist or racially motivated. ECF No. 24 at 13. The Court agrees that Ms. McClelland's claims of racial discrimination rely on her own perceptions of the behavior, as opposed to direct evidence of discrimination.

[4] The analysis required for adjudicating claims under PHRA and PFPO is identical to a Title VII inquiry. *Jones,* 198 F.3d at 410–11. Similarly, race-based discrimination claims brought under § 1981 are also analyzed under the *McDonnell Douglas* burden-shifting framework. *See Collins v. Kimberly-Clark Pennsylvania, LLC*, 247 F. Supp. 3d 571, 588 (E.D. Pa.), *aff'd,* 708 F. App'x 48 (3d Cir. 2017). The Court, therefore, and does not need to separately address these claims. The analysis of the Title VII claims applies with equal force to her PHRA, PFPO, § 1981 claims.

she was qualified for the position in question; (3) she suffered an adverse employment action; and (4) that adverse employment action gives rise to an inference of unlawful discrimination." *Id*. (citing *Jones,* 198 F.3d at 410–11).

There is no dispute that Ms. McClelland satisfies the first two prongs of establishing a *prima facie* case – she is African-American and worked for Dechert for approximately twenty years and was internally promoted just prior to the allegations at issue in this case. The third prong of the inquiry is where Ms. McClelland fails to establish a genuine issue of material fact that she suffered an adverse employment action. An "adverse employment action," has been defined as "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998); *see also Koller v. Riley Riper Hollin & Colagreco*, 850 F. Supp. 2d 502, 518 (E.D. Pa. 2012). None of those actions were taken here by Dechert or Ms. Wry. Even so, Ms. McClelland's proffered evidence does not sufficiently satisfy the fourth prong either of establishing an inference of unlawful discrimination.[5]

### 1. Excessive Workload

---

[5] Count 3 is a claim of aiding and abetting against all Defendants under the PHRA § 955(a). Under that provision, "an individual supervisory employee can be held liable under
an aiding and abetting/accomplice liability theory pursuant to § 955(e) for his own direct acts
of discrimination or for his failure to take action to prevent further discrimination by an employee under supervision." *Davis v. Levy, Angstreich, Finney, Baldante, Rubenstein & Coren P.C.*, 20 F. Supp. 2d 885, 887 (E.D. Pa. 1998) (citing *Dici,* 91 F.3d at 552-53). Count 8 reflects a similar provision in the PFPO § 9-1103(1)(h). However, since the Court finds that no racial discrimination occurred here, there can be no successful claim for aiding and abetting.

Ms. McClelland's claims regarding "unrealistic deadlines and excessive workload" fail to create a genuine issue of material fact. ECF No. 2 ¶ 3. There is no evidence in the record, nor any assertion from Ms. McClelland, that these assignments were beyond the scope of her job description or requirements. Ms. McClelland "provides no detail about the quantity or nature of the new work." *Tomaszewski*, 460 F. Supp. 3d at 602. Ms. McClelland does not provide any examples of deadlines or unnecessary assignments. There is evidence that Defendants tried to alleviate her workload by shifting staff and re-assigning duties from Ms. McClelland to other employees, though Ms. McClelland rejected these efforts as discriminatory. Ms. McClelland claims both being overworked and having responsibilities taken from her are evidence of discrimination. Yet Ms. McClelland provides details only on the obligations she claims were taken from her and gives no details regarding alleged excessive workload and deadlines that unfairly burdened her. Without this evidence, the Court cannot find Ms. McClelland's broad assertions of excessive workload rise to the level of an adverse employment action.

Ms. McClelland also fails to show that there is a connection between her workload and deadlines and her race, other than to say generally that her non-African-American counterparts did not receive the same treatment. The timing of events shows otherwise. Just as she began her role as manager, multiple employees in her department left the company. Ms. McClelland's concerns also coincide with the beginning of remote work due to the COVID-19 pandemic and the challenges that created for her and her staff, and Ms. McClelland indicates a lack of equipment and support during that transition to remote work contributed to her workload. Ms. McClelland also admits that the billing department was transitioning from one billing system to a new, unfamiliar technology that required trainings and added responsibilities contributing to her workload. Therefore, the Court concludes Ms. McClelland has failed to provide sufficient

evidence that her workload was increased due to her race. *Nardella v. Philadelphia Gas Works*, 997 F. Supp. 2d 286, 297 (E.D. Pa. 2014) ("At the summary judgment stage, speculation cannot sustain claims of discrimination.").

                2. <u>Staffing</u>

       Ms. McClelland makes several allegations regarding the way Ms. Wry managed employees within Ms. McClelland's department, none of which constitute adverse employment actions. Ms. Wry as Director of Financial Operations and as Ms. McClelland's direct supervisor is well within her purview to inquire about Ms. McClelland's performance from both Human Resources and billing department employees. Ms. Wry was again operating within her role as Director to discuss exit interviews with Ms. McClelland to address the billing department's attrition. *See Burton v. Pennsylvania State Police*, 990 F. Supp. 2d 478, 505 (M.D. Pa. 2014), *aff'd*, 612 F. App'x 124 (3d Cir. 2015) ("[A] mere investigation is not an adverse employment [action]."). Ms. McClelland is practically alleging that any review of her performance was discriminatory, though there is no evidence this was abnormal behavior for a supervisor. Ms. Wry is also well within her role as supervisor to re-assign responsibilities amongst the department. Ms. McClelland herself testified that she was "drowning" in work and her department was understaffed. Ms. Wry, as the overseer of financial operations, would make changes in the billing department to spread responsibilities more evenly. Ms. Wry was again well within her role as supervisor to request to be included in team meetings during remote work due to the pandemic. While Ms. McClelland found some of these staffing decisions "very embarrassing" that does not constitute an adverse employment action.

       Ms. McClelland lists other staffing related complaints, including staffing disagreements in e-billing, training of new billers, being forced to share training session responsibilities with a

co-worker, and being forced to share hiring responsibilities with Ms. Wry. She also claims Ms. Wry hired a billing coordinator against Ms. McClelland's advice. There is no evidence on the record that Ms. McClelland was supposed to have final say in hiring or staffing decisions. Yet, she seems to object to any attempt by her supervisor to oversee the department. Even if Ms. McClelland was not consulted on any staffing changes in her department, that does not adversely affect her employment, nor does Ms. McClelland adequately attribute it to racial bias.

### 3. Performance Evaluations

Despite the overall positive feedback in her performance reviews, Ms. McClelland asserts that those evaluations are evidence of bias. The Court disagrees. Ms. Wry evaluated Ms. McClelland as either "exceeds expectations" or "meets expectations" in the December 2019 performance review. Ms. McClelland subsequently received a salary increase. Her subjective perception that her work was above and beyond, does not counter in any way the evidence that she received a satisfactory evaluation and a salary increase. As for the 2020 mid-year evaluation, the evaluation allegedly contained inaccurate and false information, but Ms. McClelland never identifies what information was problematic or how it could lead to an inference of discrimination. Ms. McClelland admitted in her deposition that she did not feel the negative feedback on her communication and collaboration skills were racially motivated. Ms. Wry also praised Ms. McClelland for being a hard worker. There was no change in salary following the evaluation and no apparent impact on Ms. McClelland's employment. The Court, therefore, concludes that there is no adverse employment action in slightly disappointing performance reviews from an employer.

### 4. Conference Reimbursement

Ms. McClelland asserts that she was discriminated against due to a reimbursement issue regarding a professional conference in the summer of 2019. Ms. Wry invited Ms. McClelland to attend a conference and Ms. McClelland initially declined to attend when she was told to advance and later submit for reimbursement her registration, flight, and hotel expenses. In an effort to compromise, Ms. Wry informed Ms. McClelland that she would only need to advance payment for her hotel and Ms. McClelland accepted the offer. Even though she was invited to attend the conference by her employer and offered a compromise on the reimbursement complaint, Ms. McClelland still asserts that being asked to pay her expenses and wait for reimbursement is evidence of discrimination. However, evidence of Dechert's standard policy refutes that assertion. Dechert's Travel and Entertainment Expense Policy specifies that "[t]he firm will reimburse [employees] for business related transportation and entertainment expenses." ECF No. 25 ¶ 15. These circumstances show that Ms. Wry obtained an exception to the policy when Ms. McClelland stated an inability to pay, evidence of accommodation not discrimination.

### 5. Remaining Incidents

Ms. McClelland's remaining alleged examples of discrimination are, at best, trivial incidents that neither rise to the level of an adverse employment action nor do they give rise to an inference of unlawful discrimination. While Ms. McClelland may have felt slighted by her company's decision not to announce her on a large conference call, that short-term unhappiness can hardly be seen as affecting the terms or conditions of her employment. It should also be noted that another employee, for which there is no evidence he is African-American, was also not supposed to be announced on the call, though he was inadvertently introduced by someone later. Similarly, Ms. McClelland's complaints that a third-party consultant did not identify her as billing manager in some correspondence also has minimal effect except possibly on Ms.

McClelland's subjective sense of pride. There is no evidence that these consultants ever met Ms. McClelland in person or were even aware of her race.

Further, a single incident of someone else being called Ms. McClelland's job title and a single instance of Ms. Wry failing to remember Ms. McClelland's requested time off are common workplace grievances that do not seem to have had any objective effect on Ms. McClelland's employment.

### 6. Reports of Discrimination

Finally, Ms. McClelland makes broad allegations that her complaints regarding discrimination were not properly addressed by the firm's Human Resources department. While there remain some factual disputes about when Ms. McClelland made complaints against Ms. Wry, whether those complaints alleged racial bias and whether Ms. McClelland followed up with Human Resources at the time of those complaints, none are material to Ms. McClelland's claim of discrimination. There must be an adverse employment action in response to her complaints and an inference she was mistreated based on her race. Neither exist in this case.

There is, however, evidence that suggests the opposite. For instance, in August 2020, when Ms. McClelland reported Ms. Wry to the Director of Human Resources, in response to Ms. McClelland's complaints, the Director of Human Resources scheduled multiple meetings. The Director referred Ms. McClelland to the Director of Diversity and Inclusion and the two met regarding the complaint. Human Resources followed up with both Ms. Wry and Ms. Wry's supervisor. Human Resources also arranged a meeting between Ms. McClelland, Ms. Wry and Ms. Wry's supervisor. At no point during multiple meetings with Human Resources did Ms. McClelland mention discrimination. Ms. McClelland identifies no evidence that she was ever disciplined by either Ms. Wry or Human Resources for lodging a complaint. There is no genuine

issue of material fact regarding discrimination as a consequence of Ms. McClelland's alleged reports of bias because there is no evidence that Dechert or Ms. Wry treated Ms. McClelland any differently or in a manner that affected the terms or condition of her employment following the complaints.

### 7. Constructive Discharge

Ms. McClelland claims that she was constructively discharged and forced to resign due to racial discrimination and harassment from her supervisor Ms. Wry. In early 2019, Ms. McClelland was promoted to Billing Manager and obtained a salary increase. Ms. McClelland was awarded another pay increase in 2020. Later in 2020, when an Assistant Biller resigned, stating during an exit interview that it was partially due to Ms. McClelland's communication style, Dechert hired and paid for an executive coach for Ms. McClelland. After only one month, Ms. McClelland declined further coaching sessions because of the time commitment. Months later, Ms. McClelland submitted her resignation letter, which made no mention of discrimination or harassment. It was only during her exit interview that Ms. McClelland made an explicit mention of racial discrimination against her supervisor and employer.

Employee resignations are presumed to be voluntary. *See Leheny v. City of Pittsburgh*, 183 F.3d 220, 227 (3d Cir. 1999). "This presumption remains intact until the employee presents evidence to establish that the resignation […] was involuntarily procured." *Id*. "In evaluating constructive discharge claims, courts in this circuit apply an objective test to determine whether the employer knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign." *Nagle v. RMA, The Risk Mgmt. Ass'n*, 513 F. Supp. 2d 383, 392 (E.D. Pa. 2007) (internal citations and marks omitted). The question is not whether Ms. McClelland suffered from adverse actions but whether a reasonable person,

when faced with these circumstances, would feel forced to resign. *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1084 (3d Cir. 1996) (internal citation and marks omitted).

"Courts consider a number of factors in determining whether an employee was forced to resign, including whether (1) she was threatened with discharge; (2) she was encouraged to resign; (3) she was demoted or suffered a reduction in pay or benefits; (4) she was involuntarily transferred to a less desirable position; (5) her job responsibilities were altered; and (6) she began receiving unsatisfactory job evaluations." *Seeney v. Elwyn, Inc.*, 409 F. App'x 570, 573 (3d Cir. 2011).

Here, Ms. McClelland provides no evidence, or even any indication, that she was forced to resign. She relies on her own self-serving statements, provided after the submission of her letter of resignation. She was never threatened by Dechert or Ms. Wry with termination or a demotion. There is no evidence or even accusation that there were discussions about her resignation prior to Ms. McClelland submitting the letter. Ms. McClelland maintained her job title and compensation throughout 2020, and even earned a salary increase at the start of the year. Even though Ms. McClelland wanted marks of "above and beyond," she received favorable marks of "meets expectations" or "exceeds expectations" in her performance reviews.

The only possible claim Ms. McClelland could make relates to her job responsibilities being altered. However, Ms. McClelland fails to explain or provide evidence on the scope of her employment and how it may have been altered. Minor complaints regarding staffing changes for training sessions and hiring against Ms. McClelland's advice do not qualify as employment altering actions. *See Goss v. Exxon Off. Sys. Co.,* 747 F.2d 885, 888 (3d Cir. 1984) (finding constructive discharge where employee was reassigned to a different territory based on her sex and it caused a substantial decrease in pay); *see also Nagle*, 513 F. Supp. 2d at 392 (quoting

*Gray v. York Newspapers, Inc.,* 957 F.2d 1070, 1083 (3d Cir.1992)) ("the employment

discrimination laws do not 'guarantee[ ] a working environment free of stress.'").

     In this case, Ms. McClelland subjectively determined that she no longer wanted to work

at Dechert but "the law of constructive discharge does not permit an employee's subjective

perceptions to govern [the] claim." *Gray,* 957 F.2d at 1083 (internal citations and marks

omitted); *Taylor v. Brandywine Sch. Dist.*, 202 F. App'x 570, 576 (3d Cir. 2006) ("These bare

and unsubstantiated allegations are not sufficient to meet [plaintiff's] burden [to establish

constructive discharge].").

### B.  Hostile Work Environment

     Title VII is not "a general civility code for the American workplace." *Burlington N. &*

*Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). In order to make out a *prima facie* case for a

hostile work environment, plaintiff must demonstrate the following five elements: (1) that she

suffered intentional discrimination because of her race; (2) that this discrimination was severe or

pervasive; (3) that the discrimination detrimentally affected Plaintiff; (4) that it would

detrimentally affect a reasonable person of Plaintiff's race; and (5) that there exists respondeat

superior liability. *Abramson v. William Paterson Coll. of N.J.,* 260 F.3d 265, 267 (3d Cir. 2001).

     "The discriminatory conduct must be so extreme as to amount to a change in the terms

and conditions of employment. Unless they are extremely severe, offhand comments and isolated

incidents are insufficient to sustain a hostile work environment claim." *Woodard v. PHB Die*

*Casting,* 255 Fed. App'x. 608, 609 (3d Cir. 2007) (citations omitted); *Faragher v. City of Boca*

*Raton,* 524 U.S. 775, 788 (1998) ("[The] conduct must be extreme to amount to a change in the

terms and conditions of employment."); *Jennings-Fowler v. City of Scranton*, 680 F. App'x 112,

117 (3d Cir. 2017) (finding complaints that a male coworker slammed photos on plaintiff's desk

and demanded that she explain a work decision, asked her to redo her work, and disparaged her in front of her peers and the public, "while annoying and possibly embarrassing, do not rise to the level of humiliating or threatening, and did not unreasonably interfere with [plaintiff's] job.").

Ms. McClelland has not proven that she was subject to intentional discrimination due to race or that she suffered from pervasive and regular mistreatment.[6] As stated above, Ms. McClelland has not provided evidence that she suffered from mistreatment that gives rise to an inference of racial bias. Accordingly, the record does not support the higher standard of showing intentional discrimination based on race.

Even so, the record lacks any showing of pervasive and regular discrimination. Though there are some differences in how this prong is defined, both the Supreme Court and the Third Circuit have held that "isolated incidents" that are non-serious are insufficient to establish an issue of material fact for this element of the test. *Ogden v. Keystone Residence*, 226 F. Supp. 2d 588, 599 (M.D. Pa. 2002); *Larochelle*, 210 F. Supp. 3d at 695 (citing *McCloud v. United Parcel Serv., Inc.*, 543 F.Supp. 2d 391, 399 (E.D.Pa. 2008)) ("Where no serious or severe incidents occur, an individual cannot rely upon casual, isolated, or sporadic incidents to advance a hostile work environment claim."). Ms. McClelland relies primarily on such isolated or sporadic incidents to state her claim. One person failed to introduce her on a conference call, another excluded her from emails, another failed to follow up on her complaints to Human Resources, etcetera. Presuming these instances occurred exactly as stated and constitute discrimination, they all come from different people in isolated instances that occur sporadically over nearly two years. The only somewhat consistent claims of hostility are against Ms. Wry, though these

---

[6] As Ms. McClelland fails to satisfy at least two elements necessary to succeed on a claim for hostile work environment, the Court need not address the other criteria.

circumstances still do not occur on a pervasive or regular basis. Ms. Wry allegedly gave negative feedback on reviews and at a few meetings scattered over the course of two years and would give excessive amounts of work at unspecified times. Even the complaints over staffing assignments and changes occurred only a handful of times. Title VII, however, "does not protect against all workplace difficulties, including crass and unwarranted behavior[.]" *Nardella*, 997 F. Supp. 2d at 297 (citing *Saidu–Kamara v. Parkway Corp.,* 155 F.Supp.2d 436, 439 (E.D.Pa. 2001)).

Courts have granted summary judgment where a plaintiff fails to prove a clear pattern or repeated incidents of harassment. *See e.g.*, *Saidu–Kamara*, 155 F.Supp.2d at 439–40 (E.D.Pa. 2001) (granting summary judgment on hostile work environment claim because four incidents over a period of a year and a half are insufficient evidence of a hostile work environment). Here, Ms. McClelland is unable to establish through evidence on the record that any genuine issues of material fact exist as to her hostile work environment claim. Accordingly, Defendants are entitled to summary judgment.

### C. Retaliation

Ms. McClelland also brings a claim of retaliation under the PHRA, which makes it "unlawful for an employer to retaliate against an employee for either opposing any practice made unlawful by their respective provisions or for participating in any manner in an investigation, proceeding, or hearing under their respective provisions." *Daniels v. Sch. Dist. of Philadelphia*, 776 F.3d 181, 192 (3d Cir. 2015) (citing 43 Pa. Stat. § 955(d)) (internal marks omitted). Once again, since there is no direct evidence of retaliation, the Court uses the burden-shifting framework in *McDonnell Douglas*. "[A] plaintiff asserting a retaliation claim first must establish a prima facie case by showing (1) [that she engaged in] protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity;

and (3) a causal connection between the employee's protected activity and the employer's adverse action." *Daniels*, 776 F.3d at 193 (internal citations omitted).

For the purposes of summary judgment, the Court will assume without analysis that Ms. McClelland's various complaints to Human Resources qualify as protected employee activity, though it is unclear if or when Ms. McClelland complained of racial discrimination prior to her exit interview. As to the second prong, requiring adverse action in response to or during the protected activity, the Court "examine[s] the challenged conduct from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Daniels*, 776 F.3d at 195 (internal citations and mark omitted). "[P]laintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* "[M]inor annoyances and simple lack of good manners" is insufficient. *Burlington N. & Santa Fe Ry. Co.,* 548 U.S. at 68.

Dechert and Ms. Wry's alleged treatment of Ms. McClelland fall far short of materially adverse to her employment. The Court detailed above how Ms. McClelland's factual assertions and the evidence provided do not constitute discrimination or hostile work environment. At every instance where Ms. McClelland made complaints, whether it was about bias or something else, Dechert employees and Human Resources all scheduled meetings to address the complaints. Ms. McClelland was never ignored or pushed out in that respect. Over a period of approximately two years, Ms. McClelland met with the Director of Human Resources, the Director of Diversity and Inclusion, Dechert's CFO, Ms. Wry's supervisor, and frequently Ms. Wry, all to respond to Ms. McClelland's complaints. In the summer of 2020, when a question was raised about Ms. McClelland's communication style by an exiting employee, Dechert paid for an executive coach

to have private sessions with Ms. McClelland, which she refused to continue after a month. Ms. McClelland views this executive coaching as retaliation, but no reasonable person would view private training sessions for a managerial employee as punishment. These sessions also occurred immediately following another employee's complaints about Ms. McClelland's communication style and there is no evidence showing that Dechert had any other motivation for encouraging these executive training sessions. Ms. McClelland also elected to end these sessions and there is no evidence she was disciplined for choosing not to continue the training. While Ms. McClelland characterizes this training as extensive, she admits to ending the training after only one month.

Furthermore, none of Ms. McClelland's complaints or follow-up meetings resulted in formal discipline. She was never demoted from her position as Billing Manager, nor did she suffer a pay decrease. Quite the opposite – at the end of 2019, following an overall positive performance review, Dechert offered Ms. McClelland an increase in salary.

Ultimately, most, if not all, of Ms. McClelland's issues with Dechert and Ms. Wry were responded to with efforts to address the problem, not ignore it or alter her employment conditions in an adverse manner. For example, after being personally invited to attend an out-of-state conference, Ms. McClelland complained of Dechert's reimbursement policy and Ms. Wry responded by compromising to address Ms. McClelland's financial concerns. While Ms. McClelland may be subjectively dissatisfied with her interactions with Ms. Wry or other Dechert employees, that does not mean an adverse employment action occurred.

Finally, Ms. McClelland provides no evidence showing a causal connection between her various complaints and her treatment at work. It is unclear from Ms. McClelland's own testimony exactly when complaints were made alleging bias against Ms. Wry or Dechert, which makes it difficult for the Court to discern any connection between such complaints and the

employer's conduct. Regardless, Ms. McClelland "cannot establish that there was a causal connection without some evidence that the individuals responsible for the adverse action knew of [her] protected conduct at the time they acted." *Daniels*, 776 F.3d at 196. Ms. Wry testified that she was not aware of any claims of racial discrimination against her until Ms. McClelland's exit interview. Ms. McClelland states that Ms. Wry must have known but does not explicitly identify when or how such an accusation was made clear to Ms. Wry. It is also unclear when and how Dechert was made aware of racial bias prior to Ms. McClelland's exit interview. Despite having multiple performance reviews during the relevant period, Ms. McClelland did not make any complaints about racial discrimination in her performance self-evaluations. Ms. McClelland's speculation does not sufficiently rebut this evidence that Ms. Wry and Dechert lacked knowledge of her protected conduct, particularly at the time of much of the alleged adverse actions. *Daniels*, 776 F.3d at 197 ("the temporal proximity of adverse action to protected conduct does not establish that the adverse actor had knowledge of the protected conduct before acting."). Ms. McClelland also claims that other employees mistreated her because of Ms. Wry's alleged bias against her but Ms. McClelland "cannot justifiably rely on mere speculation that these adverse actors learned of her complaints from other employees[.]" *Id.*

Furthermore, other than her alleged constructive discharge, Ms. McClelland has not specified a single instance of adverse employment action that was connected by some evidence to protected activity. Many of Ms. McClelland's complaints about micromanagement and staffing changes occurred in the first half of 2019, before her protected activity began. As to constructive discharge, this Court finds above that Ms. McClelland's resignation was voluntary and not forced upon her by harassment. There is no evidence Ms. McClelland's resignation was caused by her complaints nor is there evidence of racial bias surrounding the events leading to

her resignation. No reasonable trier of fact could conclude that Ms. McClelland's work environment was so intolerable that she had no choice but to resign. *See Tunis v. City of Newark,* 184 Fed. App'x. 140, 143 (3d Cir. 2006) ("While the law protects employees from concerted, calculated efforts to expel them or the imposition of unduly harsh conditions not visited upon their co-worker in order to force them to quit, it does not guarantee that they will not suffer frustrations, challenges, disappointments and discipline").

V.    **CONCLUSION**

The Court concludes that there is no genuine dispute of material fact with respect to any of Ms. McClelland's discrimination, hostile work environment or retaliation claims and that Defendants Dechert and Ms. Wry are entitled to judgment as a matter of law on each claim. Ms. McClelland has failed to produce sufficient evidence such that a reasonable jury could rule in her favor. Therefore, the Court grants summary judgment in favor of Defendants on all remaining Counts.

BY THE COURT:

/s/ Chad F. Kenney
CHAD F. KENNEY, JUDGE